OLSZEWSKI, Judge:
Darryl Butler appeals his life sentence for the first-degree murder of Shadrack Townes. On May 21, 1992, Butler and two other men drove to 3449 North Orianna Street, where they encountered Shadrack Townes and Yolanda Watson. Butler and Townes were acquainted with each other, and began to argue about an earlier incident where Townes had apparently insulted the wife of one of Butler’s friends. The argument lasted several minutes, but the two stayed reasonably calm. Butler suddenly pulled out a semi-automatic pistol and shot Townes twice in the abdomen. Townes collapsed on the sidewalk. Butler began to walk away, but then turned around and shot Townes another dozen or so times. Butler put the gun to Townes’ head to administer the coup de grace, but the gun merely clicked when Butler pulled the trigger — the ammunition was spent. Butler fled with his two friends.
Yolanda Watson and another eyewitness who observed the shooting later identified Butler from a photo array. Townes also noticed that Butler wore a necklace with the name “Darryl,” and told police as he lay bleeding on the sidewalk that Darryl had shot him. Townes died within hours of the shooting. The next morning detectives arrived at Butler’s girlfriend’s apartment with an arrest warrant. There they discovered in plain view a box for a rare, heavier than normal type of nine-millimeter ammunition which matched casings found near Townes’ body.
Butler chose not to testify at his jury trial. His girlfriend provided an alibi, claiming that she, Butler and their children had spent the day at the zoo. Butler specifically did not dispute the events surrounding Townes’ death; he simply claimed that he couldn’t have been the shooter since he wasn’t there. The jury found otherwise and convicted Butler of first-degree murder and possessing an instrument of crime. Butler received the *931 mandatory life sentence for the murder, and a concurrent one to two years for the PIC charge.
I.
Butler has shifted tactics and now disputes the events surrounding Townes’ death. He acknowledges having shot Townes, but argues that he did so in self-defense when Townes stepped towards him during their argument. Alternatively, Butler argues that the homicide should be considered either voluntary manslaughter or murder in the third degree, rather than first degree.
Butler offers absolutely no citation to the record to support his current theory that Townes suddenly came at him. This is not surprising, considering that no such evidence was ever introduced at trial, where Butler offered an alibi defense instead. Since Butler did not raise the issue of self-defense at trial, the Commonwealth had no burden to disprove it. Nor can Butler argue self-defense for the first time on appeal; the claim is waived. Commonwealth v. Clair, 458 Pa. 418, 326 A.2d 272 (1974).
Nor did Butler mention his alternative theories of voluntary manslaughter and third-degree murder below, so they are likewise waived. Butler merely claims that “it is possible [he] was acting under serious provocation when the decedent was shot.” Appellant’s brief at 18. If so, then Butler should have argued this claim at his trial. Such a bald assertion, without any development or support, is unreviewable. It also contradicts the testimony from the Commonwealth’s witnesses that Butler and Townes argued without any shouting or threatening gestures. N.T. 3/22/93 at 33-34.
Butler’s entire third-degree murder argument is that his “actions showed an intent to inflict bodily injury, and maybe even serious bodily injury but it never showed a specific intent to kill.” Appellant’s brief at 14. The Commonwealth’s evidence proved that after Butler dropped Townes with two shots to the abdomen, Butler began to leave, but then returned, pumped about a dozen more bullets into Townes, and would have finished Townes off with a round through the skull if he’d had any bullets left. We cannot imagine how one could possibly demonstrate a more specific intent to kill. In sum, the evidence amply sustains Butler’s conviction for first-degree murder, and none of Butler’s novel and undeveloped sufficiency arguments have the slightest merit.
II.
Butler also challenges the weight of the evidence. The decision to grant a new trial based on a challenge to the weight of the evidence is within the sound discretion of the trial court. Absent abuse of discretion, we will not reverse the trial court’s ruling. Commonwealth v. Eddowes, 397 Pa.Super. 551, 580 A.2d 769 (1990), alloc. denied, 529 Pa. 631, 600 A.2d 951 (1991). A trial court may award a new trial on this basis' only where a verdict is so contrary to the evidence so as to shock one’s sense of justice and make the award of a new trial imperative. Commonwealth v. Murray, 408 Pa.Super. 435, 597 A.2d 111 (1991), alloc. denied, 529 Pa. 668, 605 A.2d 333 (1992).[1]
Butler points to discrepancies between eyewitnesses Yolanda Watson’s and Devin Boomer’s trial testimony and statements they made to police after the shooting. Butler claims that the discrepancies show these witnesses to be incredible. Appellant’s brief at 15. Assessing the credibility of a witness, however, is within the province of the jurors, who are entitled to believe all, part, or none of the evidence. Commonwealth v. Westcott, 362 Pa.Super. 176, 523 A.2d 1140 (1987), alloc. denied, 516 Pa. 640, 533 A.2d 712 (1987). Moreover, the disputed testimony goes only to how long Yolanda Watson remembered seeing Butler in the neighborhood before the shooting, and whether Devin Boomer attended junior high *932 school with Butler. These issues are wholly collateral to the central evidence supporting the verdict: how carefully the witnesses observed the shooting itself and the soundness of their identification. Hence, the verdict was not against the weight of the evidence.
III.
As Shadrack Townes lay dying on the sidewalk, Police Officer Gaul informed him that he didn’t look too good, might not make it, and asked him who had shot him. Townes repeated several times that “Darryl did it.” N.T. 3/19/93 at 77-78. The trial court allowed Officer Gaul to testify to this hearsay statement as a dying declaration. Butler asserts that this ruling was error, because before Townes made the declaration to Officer Gaul, he told Yolanda Watson’s sister not to worry, that he wasn’t going to die. N.T. 3/22/93 at 64. The trial court reconsidered the testimony concerning the grave extent of Townes’ injuries, the imminence of his death, and the timing of his declarations (i.e., his initial response that he wasn’t going to die, followed by the poor prognosis from Officer Gaul and subsequent declaration that Darryl did it) and decided that the statement was properly admitted as a dying declaration. Trial court opinion, 3/18/94 at 7. Like all evidentiary matters, we will not reverse this ruling absent an abuse of discretion. Commonwealth v. Frederick, 508 Pa. 527, 498 A.2d 1322 (1985).
We agree with the trial court that the statement satisfied the requirements for the dying declaration exception to the hearsay rule. The medical examiner testified that Townes’ wounds were so grave that he could have died in a matter of minutes, although he lasted for three hours. Considering all of the relevant factors, the trial court properly concluded that Townes believed his own death was at hand, and his forceful, repeated declarations that “Darryl did it” bore the solemn reliability of this most grim occasion. One isolated remark, in all likelihood made to comfort a concerned bystander, will not automatically remove Townes’ identification of Butler from the purview of the dying declaration exception. See Commonwealth v. Hawkins, 448 Pa. 206, 292 A.2d 302 (1972) (admissibility of dying declaration depends on all surrounding circumstances).
IY.
The court instructed the jury in the usual manner that the value of eyewitness identification testimony depends upon the witness’ capacity to observe and recollect events. N.T. 3/29/93 at 100-02. Butler claims that the trial court should have gone further and given a Kloiber instruction, which would have admonished the jury to view especially weak identification testimony with added caution. See Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820, cert. denied, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954). Butler asked for the special instruction for the same reasons he claims his conviction is against the weight of the evidence: because eyewitness Yolanda Watson claimed to have seen Butler around the neighborhood for a longer period than Butler was actually there, and eyewitness Devin Boomer was mistaken about attending junior high school with Butler.
A Kloiber instruction is only required where the witness did not clearly observe the defendant, or where the identification is equivocal, or the witness has had past problems identifying the defendant. See Commonwealth v. Johnson, 419 Pa.Super. 625, 615 A.2d 1322 (1992), alloc. denied, 533 Pa. 657, 625 A.2d 1191 (1993). The trial court correctly observed that no such factors were present in the instant identifications; both witnesses observed the murder close up, and had no trouble identifying Butler afterward. The issues Butler raises have nothing to do with the quality of the identification testimony, and did not require a Kloiber instruction.
Y.
Butler’s final issue concerns allegedly inflammatory remarks in the prosecutor’s closing argument. Because his trial counsel did not request a mistrial for these remarks, Butler raises the issue in terms of ineffective assistance of counsel. After carefully reviewing the trial transcript and arguments, we find that Butler’s trial counsel was not ineffective because none of the remarks mer *933 ited a mistrial. See Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973 (1987) (claim of ineffectiveness must have arguable merit, no reasonable basis for promoting defendant’s interests, and must prejudice defendant).
Butler identifies three passages from the prosecutor’s closing argument which he claims had the unavoidable effect of poisoning the jurors’ minds with hostility and bias, rendering them incapable of objectively weighing the evidence and rendering a true verdict. See Commonwealth v. Ragan, — Pa. -, 645 A.2d 811 (1994) (describing prosecutorial misconduct standard). None of the prosecutor’s remarks constitute misconduct, and Butler’s ineffectiveness claims thus lack merit.
A.
The first allegedly improper remark came in response to the questions defense counsel raised about the photo array used to identify Butler. Dining the trial, the prosecution was about to introduce the array into evidence, but the defense objected. After a sidebar conference, the court sustained the defense objection and decided not to allow the prosecution to introduce the array. The defense did not introduce the photo array into evidence either. N.T. 3/22/93 at 87-90.
During his closing argument, defense counsel questioned whether the photo array included a picture of Dwayne Fountain, the brother of Butler’s girlfriend, who the defense had suggested might be responsible for shooting Townes. Defense counsel argued, “In the pictures that Yolanda Watson reviewed, was Dwayne Fountain’s picture in there? Does anybody know? I don’t. We’ll never know that because nothing was presented.” N.T. 3/29/93 at 33. At this point the prosecutor objected, pointing out that the matter was the subject of a sidebar ruling earlier in the trial. The court overruled the objection, stating, “You may argue ... when it is your turn.” Id.
During his closing argument, the prosecutor tried to respond by pointing out that it was the defense which kept the photo array out of evidence. Clearly the prosecutor was galled by the defense tactic of blaming the prosecution for not introducing the photo array, because the prosecutor kept trying to make the point despite three separate defense objections. After sustaining the third objection, the court instructed the jury not to draw any unfavorable inference from the non-introduction of any particular piece of evidence. Id. at 48-50.
The trial court later concluded, and we agree, that the prosecutor’s comments were a fair response to the defense suggestion that the prosecution was trying to hide the photo array, when in fact it was the defense which kept the photo array away from the jury. Trial court opinion, 3/18/94 at 4. A prosecutor is entitled to respond to defense arguments. See Commonwealth v. McKendrick, 356 Pa.Super. 64, 514 A.2d 144 (1986), alloc. denied, 514 Pa. 629, 522 A.2d 558 (1987). Here, the response to defense counsel’s disingenuous tactic was appropriate and measured. The prosecutor concluded the episode by echoing the trial court’s instruction that the jury draw no unfavorable inference from the non-introduction of the photo array: “[Defense counsel] can’t stand up there and ask you to speculate about the photos in here when you never saw it, because the question was never asked.” N.T. 3/29/93 at 50. The prosecutor’s remarks did not merit a mistrial, and were not the least bit prejudicial or inflammatory.
B.
The next set of remarks were not as justified, but were completely non-prejudieial. At trial, Kimberly Gregory, Butler’s girlfriend, offered an alibi defense that she, Butler and their children went to the zoo the day of the shooting, and spent the rest of the evening at Butler’s aunt’s house. N.T. 3/23/93 at 30-31. The Commonwealth rebutted this alibi the next day by calling two police officers who went to Gregory’s apartment the evening of the shooting and found Gregory there — not with Butler at his aunt’s. N.T. 3/24/93 at 25. The defense called Tamika Bullock, a friend of Gregory’s, as a surrebuttal witness to testify that she was at Gregory’s apartment that evening, so the officers must have encountered her and not Gregory. Id. at 47-49.
*934 At closing arguments, the prosecutor sought to show bias by implying that Bullock and Gregory must have gotten together and planned Bullock’s testimony in order to shore up the alibi defense. The trial court sustained defense counsel’s objection that when and why a witness appears is beyond the scope of the jury’s inquiry. Again, the prosecutor felt that he was entitled to hammer this point home in response to defense counsel’s earlier suggestion that the Commonwealth’s witnesses may have changed their stories when they learned that Butler hadn’t been in the neighborhood for as long as they thought. The prosecutor continued to argue about the amazing coincidence of Bullock’s appearance, and again the trial court took control after sustaining the third objection, saying:
THE COURT: ... The argument is totally and completely inappropriate and improper, members of the jury. The law is that witnesses are — can be called by either party. Nobody owns any witness.
You may listen to the testimony and decide the credibility based on what the witnesses said, any possible bias, how their testimony conforms to other testimony in the ease.
Counsel have a right to comment about the witnesses, but how they got there, whether they talked to each other or anything like that is not appropriate for you to consider.
N.T. 3/29/93 at 71-73.
We cannot conclude that the prosecutor’s remarks were an appropriate response to a disingenuous argument by defense counsel. Defense counsel had pointed to the discrepancy between Yolanda Watson’s initial recollection that she had known Butler since the summer of 1991, and the fact that Butler was in jail until November of 1991. Id. at 21-24. This was a matter of fair comment. Defense counsel focused on this discrepancy in an effort to create reasonable doubt. Defense counsel did not suggest that the Commonwealth witnesses ever got together and arranged their testimony.[2] But the prosecutor apparently felt that such an implication was made, because after the third objection and the court’s cautionary instruction, the prosecutor asked that a portion of the defense counsel’s closing be stricken. Id. at 73. The court stuck by its rulings, and closing arguments proceeded. Id. at 74.
We must acknowledge that this ineffectiveness argument has some slight merit, only because the prosecutor’s stubborn persistence in arguing an improper point despite three separate sustained objections cannot be taken lightly. But the material at issue, whether Tamika Bullock’s testimony was rehearsed, was a relatively minor matter — it merely reiterated the legitimate argument concerning Bullock’s interest in the case and potential bias. We agree with the trial court that it was not the sort of improper argument which could have justified a mistrial. Trial court opinion, 3/18/94 at 4-5. In any event, the comments would certainly not engender any fixed bias or hostility toward Butler, and thus were not the least bit prejudicial.
C.
The third remark sounds prejudicial, but is benign when taken in context. As discussed above, the defense harped on the discrepancy in Yolanda Watson’s testimony, since this was perhaps its most promising avenue to *935 reasonable doubt. The prosecution had to acknowledge the discrepancy, but sought to put it in perspective:
You’re here to decide if she told the truth on the stand, not if she made a little mistake on a multi-page statement. And when she was asked about that at the preliminary hearing, when she was given the first opportunity to be specific about it when [defense counsel] asked her questions at that preliminary hearing, she said only for a couple of months have I been seeing him out there. Only for a couple of months.
And it’s the same thing she said on the witness stand. So how does that mak[e] a major league mistake? And when you think about it, we’re talking seven months versus 12 months.
If you figure from November the 6th to May 21st, that’s seven months. Big mistake. She was off on five months. Wow! Let’s acquit this man and have him gun down somebody and have him shoot them 15 times in cold blood. And that’s the only thing you can point to in terms of what she had to say. It’s that one little line. Because there’s an answer to everything else.
Like I said before, her friend was gunned down before her four hours before. She made that mistake in her statement. For that you’re going to disbelieve her? I would suggest to you not.
N.T. 3/29/93 at 79-81 (emphasis added).
Butler points to the emphasized sentence in isolation, and characterizes it as an appeal to convict, lest by acquitting, the defendant be loosed upon society to commit more murders. Such a reference to future dangerousness would indeed be improper. See Commonwealth v. Pate, 421 Pa.Super. 122, 617 A.2d 754 (1992), alloc. denied, 535 Pa. 656, 634 A.2d 219 (1993).
When considered in context, however, we see that the comment was not so intended, nor would it have been so interpreted. It was no more than a sarcastic attempt to juxtapose the magnitude of the instant crime against the one minor and collateral discrepancy in Yolanda Watson’s testimony. Not only does this interpretation emerge from a fair reading of the record, but at a post-trial effectiveness hearing the trial court recalled that it was not meant or taken as a prediction of future dangerousness. N.T. 2/16/94 at 30. The trial court’s recollection of the remark must be given great deference when deciding whether a mistrial was warranted. Commonwealth v. Palmer, 315 Pa.Super. 601, 462 A2d 755 (1983). This remark also falls short of the standard for prosecutorial misconduct, and defense counsel was not ineffective for not requesting a mistrial.
Judgment of sentence is affirmed.

. In Murray, this Court affirmed its right and duty to review a trial court's refusal to grant a new trial on the basis that the verdict is against the weight of the evidence. But see 408 Pa.Super. at 442, 597 A.2d at 115 (Olszewski, J., concurring and dissenting) (appellate courts should not review of weight of the evidence challenges; to do so improperly invades the jury’s fact-finding province).

. In discussing the discrepancy, defense counsel did use terminology suggestive of arranged testimony:
... Darryl was in prison until November. They couldn’t have possibly known him that period of time. He wasn't around to be known. That's easy. Let’s huddle up and change our story. You can’t do that. I'm sorry. You can't take the square peg and bite off the corner so it fits into the round hole and hope nobody will notice. That’s why once it was all learned that Darryl wasn’t available, everybody changed.
Id. at 22 (emphasis added). At this point the trial court overruled the prosecutor’s objection, holding that the above argument was a fair reference to discrepancies in the Commonwealth's witnesses’ testimony. Id. Although defense counsel used the words "Let's huddle up," he did so in passing. There was no actual suggestion that the Commonwealth witnesses pre-arranged their testimony, just that their testimony had changed.